# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| MARIANGELICA VERA, | : | |
| Plaintiff, | : | CIVIL ACTION NO.: |
| | : | 3:12-cv-00382 (VAB) |
| v. | : | |
| | : | |
| ALSTOM POWER, INC., | : | MAY 24, 2016 |
| | : | |
| Defendant. | : | |

## RULING AND ORDER

## I.   INTRODUCTION

Plaintiff, Mariangelica Vera ("Vera"), filed this action against her former employer, Alstom Power, Inc. ("Alstom"), claiming sex discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII") and the Connecticut Fair Employment Practices Act ("CFEPA"). A jury found for Alstom on the sex discrimination claims, but found for Vera on her claims that Alstom retaliated against her for filing a complaint of discrimination with the Connecticut Commission on Human Rights and Opportunities ("CHRO") by denying her a performance evaluation and raise, and terminating her employment. The jury awarded $500,000 in non-economic damages and $350,000 in punitive damages. After the trial, the Court held an evidentiary hearing and oral argument to determine back pay and other relief. *See Broadnax v. City of New Haven*, 415 F.3d 265, 271 (2d Cir. 2005) (because back pay is an equitable remedy under Title VII, a party is not entitled to a jury determination).

This ruling addresses two post-trial motions, as well as Vera's request for back pay. First, Alstom's Motion for Judgment as a Matter of Law or, In the Alternative, a New Trial or Remittitur is GRANTED IN PART AND DENIED IN PART. The Court denies Alstom's motion for judgment as a matter of law. The Court does not order a new trial on the basis of a

1

claimed error in an evidentiary ruling, but does order a new trial on damages, unless Vera agrees to remit the non-economic damages award to $125,000 and remit the punitive damages award to $50,000.  Second, because Alstom did not prove that Vera failed to mitigate her damages, the Court awards $475,345.65 in back pay (including salary, bonuses, and 401(k) contributions), plus prejudgment interest.  Third, Vera's Motion for Reinstatement or, In the Alternative, an Award of Front Pay is GRANTED.  The Court orders Alstom to reinstate Vera.

## II.    DISCUSSION

### A.    Alstom's Motion for Judgment as a Matter of Law or, In the Alternative, a New Trial or Remittitur (ECF No. 141)

Alstom renews[1] its motion under Federal Rule of Civil Procedure 50(b) for judgment as a matter of law, arguing that the jury's verdict is unsupported by the evidence.  In the alternative, Alstom seeks a new trial on the ground that an evidentiary ruling was error.  Finally, Alstom seeks reduction of the non-economic and punitive damages awards.

### 1.    Judgment as a Matter of Law

The standard governing a motion for judgment as a matter of law is "appropriately strict." *Stubbs v. Dudley*, 849 F.2d 83, 85 (2d Cir. 1988).  The motion "may only be granted if there exists such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or the evidence in favor of the movant is so overwhelming that reasonable and fair minded [persons] could not arrive at a verdict against [it]."  *Wiercinski v. Mangia 57, Inc.*, 787 F.3d 106, 112 (2d Cir. 2015) (quoting *Brady v. Wal–Mart Stores, Inc.*, 531 F.3d 127, 133 (2d Cir. 2008)).  The Court must deny the motion "unless, viewed in the light most favorable to the nonmoving party, the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the

---

[1] Alstom moved under Federal Rule of Civil Procedure 50(a) for judgment as a matter of law at the close of Vera's case, and the Court denied that motion.  Trial Transcript [hereinafter "Tr."] 357-59, 733.

evidence, there can be but one conclusion as to the verdict that reasonable [persons] could have reached." *Cobb v. Pozzi*, 363 F.3d 89, 101 (2d Cir. 2004) (internal quotation marks omitted). The familiar *McDonnell Douglas* burden-shifting framework applies to Alstom's motion for judgment as a matter of law. *See Bucalo v. Shelter Island Union Free Sch. Dist.*, 691 F.3d 119, 128 (2d Cir. 2012) (applying *McDonnell Douglas* framework to Rule 50 motion in Title VII retaliation case); *see also Alfaro v. Wal-Mart Stores, Inc.*, 210 F.3d 111, 114 (2d Cir. 2000) ("[T]he same standard that applies to a pretrial motion for summary judgment pursuant to Fed.R.Civ.P. 56 also applies to motions for judgment as a matter of law during or after trial pursuant to Rule 50.") (quoting *This Is Me, Inc. v. Taylor*, 157 F.3d 139, 142 (2d Cir. 1998)).

Applying those principles, the Court concludes that the jury reasonably could have found that Vera's protected activity was a but-for cause, and motivating factor, in Alstom's decisions to deny her a performance evaluation and raise, and terminate her employment.

As an initial matter, Vera established a close temporal proximity between her protected activity and the adverse employment actions she suffered. She filed a CHRO complaint on September 27, 2010. Ex. 48; Tr. 133. When Alstom received the complaint, it had not yet selected Vera for termination. Tr. 267-68, 428, 638. A few weeks later, before the end of October, Alstom decided to terminate Vera. *See id.* 404, 638. Approximately six months after Vera's CHRO complaint, Alstom denied her a performance evaluation and raise. *See id.* 137, 613. Vera's supervisor's supervisor, Bruce Buchholz, testified that Alstom did not give Vera a performance evaluation because she had been identified for termination. *See id.* 613. Joan Solnick, a human resources representative, testified that Alstom did not give Vera a performance evaluation because of her CHRO complaint. *See id.* 271.

The temporal proximity between Vera's protected activity and the adverse employment

actions gives rise to an inference of retaliation.  *See Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 845 (2d Cir. 2013) (three-week period from plaintiff's complaint to her termination raised inference of retaliation); *Espinal v. Goord*, 558 F.3d 119, 129–30 (2d Cir. 2009) (six-month period from dismissal of plaintiff's lawsuit to alleged retaliatory beating supported inference of causal connection).  Of course, Vera needed to show more than temporal proximity to carry her ultimate burden.  *See El Sayed v. Hilton Hotels Corp.*, 627 F.3d 931, 933 (2d Cir. 2010) (temporal proximity raises an inference of retaliation, but is alone insufficient to show pretext).  The Court concludes that Vera did supplement her showing of temporal proximity with evidence that, viewed in the light most favorable to her, is sufficient to support the jury's verdict.

First, the jury could have inferred retaliatory animus from the reactions of Vera's supervisor, Timothy Barry, and his supervisor, Bruce Buchholz, upon learning that Vera had filed a CHRO complaint.  Barry learned the news while driving to a school alumni event.  Tr. 524.  He was "disappointed, surprised, [and] upset" and "so offended that [he] had to pull over on the side of road and check [his] blood pressure because [he] couldn't believe it."  *Id.* 506, 525-26.  The jury could have found that Buchholz was "surprised and offended" by the news and said, "You've got to be kidding me."  *See id.* 267, 638.  Shortly after Alstom decided to terminate Vera, Barry received an e-mail indicating that Vera had lost her e-mail access.  He responded, "I think I just peed a little."  *Id.* 510, 527; Ex. 51.  The jury could have disbelieved Barry's explanation for this remark, and concluded that he was excited at the possibility of Vera's termination.  *See Zellner v. Summerlin*, 494 F.3d 344, 371 (2d Cir. 2007) (in ruling on motion for judgment as a matter of law, "the court must bear in mind that the jury is free to believe part and disbelieve part of any witness's testimony.").[2]  The jury observed Barry and

---

[2] Indeed, after Barry admitted giving a "slanted version of the facts" in his deposition testimony regarding the financial performance of Vera's projects, the jury had a basis for disbelieving his testimony.  *See* Tr. 561.

Buchholz while they testified, and was free to give weight to their remarks because they were supervisors involved in the decisions to deny Vera an evaluation and terminate her employment. *See Henry v. Wyeth Pharm., Inc.*, 616 F.3d 134, 149 (2d Cir. 2010) (in determining whether a remark is probative of discrimination, courts consider, *inter alia*, whether supervisor or decision-maker made the remark).

Second, the jury reasonably could have found that Alstom's proffered reason for terminating Vera – reducing head count – was pretext.[3] In 2010, Alstom sought to reduce head count at the Windsor, Connecticut facility at which Vera worked, and within the Heat Recovery Steam Generator ("HRSG") and Project Management groups to which Vera belonged. *See* Ex. 514; Tr. 395-400. The head count targets were "moving" for several months. *See* Tr. 373-74; 610; Ex. 514, 515, 517. But by late October, Alstom developed targets for its next fiscal year. *See* Tr. 395-402; Ex. 517 at 20219-20; Def.'s Mem. at 8. The head count target for the Project Management group, previously set at twelve, was reduced to ten. *See* Tr. 399-402; Ex. 514 at 20182; Ex. 517 at 20220; Def.'s Mem. at 8.

Days later, Alstom selected individuals for termination. *See* Tr. 402. Vera was among those selected. *Id.* 403. Vera testified that, after layoffs were announced in November, Barry indicated that the layoffs were over. *Id.* 136.

Two months later, Alvaro Rodriguez, another project manager in the Project Management group, resigned unexpectedly. *See id.* 63; 136-37; 641; 656. The jury reasonably could have found that Rodriguez's unexpected resignation obviated the need to carry out Vera's termination, which had not yet been executed, because Alstom had selected Vera for termination

---

[3] Alstom argues that Vera was "required to disprove Alstom's legitimate business reasons for terminating [her.]" Def.'s Mem. at 8. The law provides otherwise. *See Summa v. Hofstra Univ.*, 708 F.3d 115, 129 (2d Cir. 2013) ("In this Circuit, it is 'settled that a plaintiff in a Title VII action need not disprove a defendant's proffered rationale for its adverse actions in order to prevail.'") (quoting *Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000)).

in order to meet head count targets on the assumption that Rodriguez would stay, and the jury could have discredited contrary testimony.

When asked if his head count target changed between October 2010, when Alstom decided to terminate Vera, and May 2011, when Alstom notified Vera of her termination, Buchholz said that the targets were "constantly fluctuating," but referred to changes that led to the Project Management group's head count target of ten in October 2010.  *See* Tr. 614; 395-402; Ex. 514 at 20182; Ex. 517 at 20220; Def.'s Mem. at 8.  Again, when asked if his target in April 2011 was different than his target in October 2010, Buchholz recounted the changes that led to the Project Management group's head count target of ten in October 2010.  *See* Tr. 652; 395-402; Ex. 514 at 20182; Ex. 517 at 20220; Def.'s Mem. at 8.  In light of these responses, the jury could have found untrustworthy Buchholz's testimony regarding head count targets during the relevant period, and concluded that Vera's termination following Rodriguez's resignation was retaliatory. A finding that Buchholz's explanations were unworthy of credence may have been quite persuasive on the question of whether Alstom's true motivation was retaliation.  *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000) ("Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive.").

Buchholz offered another reason for carrying out Vera's termination despite Rodriguez's resignation: he would have needed to submit a requisition to "fill that position" and bring "that head count . . . back into the organization[,]" and requisitions were not being approved at the time.  Tr. 613-14, 642.  The jury could have disbelieved Buchholz and found that keeping Vera in the position that she had held for twenty-four years and had not yet been removed from would not have posed the insurmountable administrative hurdle that Buchholz suggested.  *See Zellner*,

494 F.3d at 371.  Similarly, while Alstom claims that the decision to terminate Vera was "not

reversible" once it was in the hands of its lawyers, Def.'s Mem. at 15, the jury could have drawn

on its common sense and concluded that Alstom was free to change its mind and instruct its

agents accordingly.  Even Buchholz testified that he "could have tried to change the decision[.]"

Tr. 644, 639.

Third, the jury reasonably could have found that Alstom did not use the same procedure

in its 2010 round of layoffs as it did in its 2009 round of layoffs to identify individuals for

termination.  *See Stern v. Trustees of Columbia Univ.*, 131 F.3d 305, 314 (2d Cir. 1997) (where

an employer's "deviat[ion] from its normal decisionmaking procedures" resulted in the

challenged employment decision, an inference of pretext may arise).  Cheryl Wilner, a human

resources director, agreed that applying regular policies and procedures in selecting employees

for layoffs helps ensure that decisions are not based on impermissible considerations.  *See* Tr.

413.  Wilner and Barry seemed to testify that Alstom employed a similar comparison and

ranking procedure in the 2010 layoffs as it did in the 2009 layoffs, but the jury could have found

their testimony suspect in light of Buchholz's admission that a document reflecting the

comparison and ranking procedure was created during the 2009 layoffs but not during the 2010

layoffs.  *See* Tr. 649-51.  The jury could have found that Alstom used a particular procedure in

the 2009 layoffs, but abandoned that procedure when deciding, a few weeks after Vera's CHRO

complaint, who would be terminated in the 2010 layoffs, and was free to infer that Vera would

have ranked well under the prior procedure, and that Alstom abandoned that procedure in order

to carry out retaliation against her.

Considering the temporal proximity between Vera's protected activity and the adverse

employment actions, as well as the evidence discussed *supra*, this is not a case where "there

exists such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture[.]" *Wiercinski*, 787 F.3d at 112. While Alstom offered reasons for its actions, the evidence did not leave "but one conclusion" that those were its true reasons. *Cobb*, 363 F.3d at 101. Rather, the jury reasonably could have found that Alstom's explanations were not credible, and that Vera was singled out for retaliatory reasons, and the Court will not second guess the jury's evaluation of the evidence. Accordingly, the Court does not grant Alstom judgment as a matter of law.

### 2.    New Trial

Alstom argues that the Court should order a new trial because it improperly precluded evidence of the fact of settlement negotiations that occurred during the period between Alstom's decision to terminate Vera and the execution of that decision, and that this affected a substantial right of Alstom's. The Court disagrees.

A district court may order a new trial under Federal Rule of Civil Procedure 59 if an erroneous evidentiary ruling affected a substantial right of the moving party. *Lore v. City of Syracuse*, 670 F.3d 127, 155 (2d Cir. 2012) ("[A]n erroneous evidentiary ruling warrants a new trial only when 'a substantial right of a party is affected,' as when 'a jury's judgment would be swayed in a material fashion by the error.'") (quoting *Arlio v. Lively*, 474 F.3d 46, 51 (2d Cir. 2007)). The standard governing a motion for a new trial is "less stringent" than the standard governing a motion for judgment as a matter of law, in that (1) the court may order a new trial even if there is substantial evidence supporting the jury's verdict, and (2) the Court may weigh the evidence and need not view it in the light most favorable to the party that prevailed at trial. *Manley v. AmBase Corp.*, 337 F.3d 237, 244-45 (2d Cir. 2003). Still, the Court may only grant a motion for a new trial "if the jury has reached a seriously erroneous result or [its] verdict is a

miscarriage of justice," or "if substantial errors were made in admitting or excluding evidence." *Stampf v. Long Island R.R. Co.*, 761 F.3d 192, 202 (2d Cir. 2014) (internal quotation marks and citations omitted).

As noted *supra*, Alstom decided in October 2010 to terminate Vera. But Alstom did not execute that decision in November, when it terminated other employees. Instead, Alstom notified Vera of her termination in May 2011, and her last day was in June. According to Alstom, the delay between the decision to terminate Vera and the execution of that decision is attributable to two circumstances. First, Vera is married to Alstom's in-house employment counsel. Consequently, Alstom retained outside counsel to offer advice with respect to Vera's termination. Second, Alstom's outside counsel and Vera's counsel were engaged in settlement negotiations during at least some of the period between October 2010 and June 2011.

Alstom claims that the Court precluded it from "introduc[ing] the fact of these negotiations to explain the timing of plaintiff's layoff," and precluded it from having its witnesses testify that "the decision was made in November and Alstom was simply waiting for its lawyer to tell them *when* plaintiff would be terminated, not *if* she would be laid off[.]" Def.'s Mem. at 14, 19 (emphasis in original). The Court disagrees. The evidentiary ruling was not error, and, in any event, did not affect a substantial right of Alstom's.

Vera introduced evidence that she was the only employee terminated in June 2011.[4] Alstom's counsel sought to rebut that point with evidence that Alstom made the decision to terminate Vera in October 2010, concurrent with its decision to terminate other employees, and the reason it waited until June 2011 to execute that decision was because settlement negotiations occurred in the interim. *See* Tr. 284.

---

[4] The parties stipulated that "[t]he plaintiff was the only member of the HRSG Windsor project management team whose employment was terminated on June 30, 2011, and the plaintiff was the only employee in Alstom's HRSG business at the Windsor, Connecticut facility who was terminated on June 30, 2011." Tr. 151.

Vera's counsel raised concerns under Federal Rule of Evidence 408, which provides that evidence of settlement negotiations is not admissible to prove or disprove the validity or amount of a disputed claim, or impeach by prior inconsistent statement, but may be admissible "for another purpose, such as proving a witness's bias or prejudice, [or] negating a contention of undue delay . . . ." Fed. R. Evid. 408.  Vera's counsel also disputed the timing of the settlement negotiations, and expressed concern that he may be required to testify to rebut any contention that settlement negotiations began before February 2011.  Tr. 285-86.

The Court told the parties that "Mr. Buchholz, Mr. Barry, and I guess Ms. Solnick, they can testify as to when they made the decisions." *Id.* 290.  Accordingly, Alstom could offer evidence as to when it decided to terminate Vera, and that evidence was admitted.  *Id.* 404, 638.

To address Alstom's concerns about rebutting Vera's point that she was the only employee terminated in June 2011, and showing that the timing of Vera's termination was the result of settlement negotiations, the Court sought "a generic phrase that could be used that doesn't necessarily significantly undercut [Rule] 408, but then allows you all to . . . rebut the notion that she has put forward." *Id.* 290.  The Court allowed Alstom to offer testimony that "there were discussions going on between lawyers[.]" *Id.* 291.

The next trial day, a witness testified that Alstom decided in October 2010 to terminate Vera's employment.  *Id.* 404.  When Alstom's counsel asked why Vera was not laid off in November, counsel had a sidebar with the Court.  *Id.*  The Court told Alstom's counsel that the witness could testify that "[s]he was waiting for instruction from the lawyers. . . . [T]hat seems to get to the fact that there was delay without getting us in dangerous 40[8] territory." *Id.* 405.

Continuing the examination of the witness, Alstom's counsel asked why it took so long to execute the termination of Vera's employment, and whether Alstom's lawyer advised the witness

to wait.  *Id.* 408-09.  The witness answered:

> This is very hard to answer without talking.  We just -- we wanted
> a better resolution.  We wanted to find a way to work between both
> parties to resolve the issue.

*Id.* 409.  The Court struck the last sentence of that response.  *Id.*

The Court's evidentiary ruling was essentially as follows.  Alstom's witnesses could

testify as to when they decided to terminate Vera.  *See id.* 290 ("Mr. Buchholz, Mr. Barry, and I

guess Ms. Solnick, they can testify as to when they made the decisions.").  To explain the delay

between that decision and its execution, the Court, consistent with Alstom's counsel's

representation that "we need not characterize them as settlement discussions," *id.* 287-88,

allowed Alstom to offer testimony that "there were discussions going on between lawyers[,]" *id.*

291, and that Alstom was "waiting for instruction from the lawyers[,]" *id.* 405.  This ruling did

not preclude Alstom from introducing evidence of the fact of discussions that resulted in the

delay, nor did it preclude Alstom's witnesses from testifying that they were waiting for

instruction from lawyers as to when, not whether, to terminate Vera.

The ruling was not error.  While Rule 408 provides that the Court "may" admit evidence

of settlement negotiations for purposes other than those prohibited, admission is not required.

*See Complex Sys., Inc. v. ABN AMBRO Bank N.V.*, No. 08 Civ. 7497 (KBF), 2014 WL 1055263,

at *4 (S.D.N.Y. Mar. 13, 2014) ("Rule 408 is not an all or nothing rule; it is not a rule which

states that all settlement communications for any purpose are out, nor is it a rule which states all

communications offered for a purpose other than to prove the validity of a primary claim are in.

Instead, the Rule enables the Court to exercise its discretion, weighing various factors, to

determine whether settlement communications offered 'for another purpose' should be

admitted.").  "[A] trial court has broad discretion as to whether to admit evidence of settlement

negotiations offered for 'another purpose.'" *Trebor Sportswear Co. v. The Ltd. Stores, Inc.*, 865

F.2d 506, 511 (2d Cir. 1989).  The Court exercised that discretion, and crafted a ruling that

allowed Alstom to offer evidence of the fact of discussions to explain the delay, without wading

into the substance of those discussions and potentially undermining Rule 408's public policy

objectives.  *See id.* at 510-11 ("[C]are should be taken that an indiscriminate and mechanistic

application of this 'exception' to rule 408 does not result in undermining the rule's public policy

objective. . . . The [court] should weigh the need for such evidence against the potentiality of

discouraging future settlement negotiations.") (quoting 2 J. Weinstein & M. Berger, *Weinstein's

Evidence* ¶ 408[05], at 408-31 (1988)).

Even if the ruling were error, it did not affect a substantial right of Alstom's.  Alstom

argues that the Court's ruling precluded it from introducing evidence that it was waiting for its

lawyers to say "*when, not if*, plaintiff was to be laid off[.]"  Def.'s Mem. at 15 (emphasis in

original).  But the Court allowed Alstom's witnesses to testify that they were "waiting for

instruction from the lawyers," Tr. 405, and nothing in the Court's ruling prohibited Alstom's

witnesses from testifying that they were waiting for instruction from lawyers as to when, not

whether, to terminate Vera.  In any event, this evidence essentially came in.  Alstom's human

resources director testified:

> We had a lot of discussion with our counsel, and because we
> already knew our intent was that she would be leaving, we'd
> already made that decision, it was more of the timing of when and
> how . . . .

*Id.* 431.  Later, Alstom's counsel asked Buchholz why Vera was not "told" in November that she

had been selected for termination.  Buchholz responded:

> There were discussions going on between lawyers that revolved
> around Ms. Vera's claims of discriminatory actions, and I was not

12

> authorized at that time to execute her layoff.  I was put on hold for
> that one.

*Id.* 612.

In sum, the Court denies Alstom's request for a new trial because the evidentiary ruling was not error, and, in any event, did not affect a substantial right of Alstom's or otherwise cause a seriously erroneous result or miscarriage of justice.

### 3.     Remittitur

#### a.     Non-economic Damages

Alstom argues that the Court should reduce the $500,000 non-economic damages award because Vera suffered "garden variety" emotional distress.  The Court agrees, and orders a new trial on damages unless Vera agrees to remit the non-economic damages award to $125,000.

"Remittiturs are a common procedure used by the courts to, in effect, reduce the amount of a damage award that the court concludes is impermissibly high."  *Turley v. ISG Lackawanna, Inc.*, 774 F.3d 140, 167 (2d Cir. 2014).  With remittitur, a court "compels a plaintiff to choose between reduction of an excessive verdict and a new trial."  *Stampf*, 761 F.3d at 204 (quoting *Shu–Tao Lin v. McDonnell Douglas Corp.,* 742 F.2d 45, 49 (2d Cir. 1984)); *accord Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 433 (1996) (district court's discretion to grant new trial includes "ordering a new trial without qualification, or conditioned on the verdict winner's refusal to agree to a reduction (remittitur).").

"Remittitur is appropriate in two situations: '(1) where the court can identify an error that caused the jury to include in the verdict a quantifiable amount that should be stricken, and (2) more generally, where the award is "intrinsically excessive" in the sense of being greater than the amount a reasonable jury could have awarded, although the surplus cannot be ascribed to a particular, quantifiable error.'"  *Anderson Grp., LLC v. City of Saratoga Springs*, 805 F.3d 34, 51

(2d Cir. 2015) (quoting *Kirsch v. Fleet Street, Ltd.*, 148 F.3d 149, 165 (2d Cir. 1998)).  This case falls in the latter category.

"Where there is no particular discernable error . . . a jury's damage award may not be set aside as excessive unless 'the award is so high as to shock the judicial conscience and constitute a denial of justice.'"  *Lore*, 670 F.3d at 177 (quoting *Kirsch*, 148 F.3d at 165).  The Court applies this "shocks the conscience" standard when reviewing a motion for a new trial or remittitur as to a federal claim.  *See Stampf*, 761 F.3d at 206 (noting distinction between "the federal 'shocks the conscience' standard" and New York state law standard); *Port Auth. Police Asian Jade Soc. of N.Y. & N.J. Inc. v. Port Auth. of N.Y. & N.J.*, 681 F. Supp. 2d 456, 469 (S.D.N.Y. 2010) ("When federal law provides the cause of action, remittitur is appropriate when the jury award includes an identifiable error of a quantifiable amount or is so high as to 'shock the conscience.'") (citing *Kirsch*, 148 F.3d at 165).

In considering a motion for a new trial or remittitur as to a state law claim, "[t]he role of the district court is to determine whether the jury's verdict is within the confines set by state law, and to determine, by reference to federal standards developed under Rule 59, whether a new trial or remittitur should be ordered."  *Stampf*, 761 F.3d at 204 (quoting *Gasperini*, 518 U.S. at 435); *accord Lore*, 670 F.3d at 177 (noting that New York standard for reviewing jury awards applied to the extent that plaintiff recovered under New York employment discrimination statute, where plaintiff also recovered under Title VII).

Under Connecticut law, "[i]f the court at the conclusion of the trial concludes that the verdict is excessive as a matter of law, it shall order a remittitur and, upon failure of the party so ordered to remit the amount ordered by the court, it shall set aside the verdict and order a new trial."  Conn. Gen. Stat. § 52-216a.  The Connecticut Supreme Court has noted that the decision

to reduce an excessive jury verdict "rests solely within the discretion of the court," and that "a court should exercise its authority to order a remittitur rarely—only in the most exceptional of circumstances." *Saleh v. Ribeiro Trucking, LLC*, 303 Conn. 276, 280-81 (2011).

"In determining whether to order remittitur, the trial court is required to review the evidence in the light most favorable to sustaining the verdict.  Upon completing that review, the court should not interfere with the jury's determination except when the verdict is plainly excessive or exorbitant. . . . The ultimate test which must be applied to the verdict by the trial court is whether the jury's award falls somewhere within the necessarily uncertain limits of just damages or whether the size of the verdict so shocks the sense of justice as to compel the conclusion that the jury [was] influenced by partiality, prejudice, mistake or corruption. . . . The court's broad power to order a remittitur should be exercised only when it is manifest that the jury [has] included items of damage which are contrary to law, not supported by proof, or contrary to the court's explicit and unchallenged instructions." *Id.* at 281 (internal quotation marks and citations omitted); *accord Bracey v. Bd. of Educ. of City of Bridgeport*, 368 F.3d 108, 117-18 (2d Cir. 2004).

Under both the federal and state standards, "a court should look to awards in comparable cases, bearing in mind the unique facts and circumstances of each case." *Graham v. City of N.Y.*, 128 F. Supp. 3d 681, 713-14 (E.D.N.Y. 2015) (citing *Stampf*, 761 F.3d at 204, *Dotson v. City of Syracuse*, 549 F. App'x 6, 8 (2d Cir. 2013), and *Tretola v. Cty. of Nassau*, 14 F. Supp. 3d 58, 83 (E.D.N.Y. 2014)).

Vera prevailed under Title VII and CFEPA, but the jury did not apportion the non-economic damages award between the two.  *See* Verdict at 2, ECF No. 127.  "Where, as here, the jury's damages award was not segregated between the state and federal claims, courts

typically adhere to the standard of review which provides the most complete recovery."
*Graham*, 128 F. Supp. 3d at 714; *accord Magee v. U.S. Lines, Inc.*, 976 F.2d 821, 822 (2d Cir.
1992) ("[W]here only a single award of damages, not segregated into separate components, is
made, the preferable rule, we think, is that the successful plaintiff be paid under the theory of
liability that provides the most complete recovery.").

However, because "'awards for mental and emotional distress are inherently speculative'
and the judicial system 'has an obligation to ensure that such awards for intangibles be fair,
reasonable, predictable and proportionate,' greater scrutiny is given to large jury awards for
mental and emotional harm to ensure that they are in line with comparable cases." *Graham*, 128
F. Supp. 3d at 714 (quoting *Turley*, 774 F.3d at 162). "[W]hen juries grant large compensatory
awards for intangible and unquantifiable injuries, such as emotional distress, pain, and
suffering," the trial court's discretion is under "substantial constraints." *Turley*, 774 F.3d at 162
(quoting *Stampf*, 761 F.3d at 205).

The Court concludes that, because Vera suffered "garden variety" emotional distress, the
jury's $500,000 non-economic damages award is plainly excessive and shocks the judicial
conscience under the federal and state standards.

"Emotional distress awards within the Second Circuit can generally be grouped into three
categories of claims: garden-variety, significant, and egregious." *Graham*, 128 F. Supp. 3d at
714 (quoting *Olsen v. Cty. of Nassau*, 615 F. Supp. 2d 35, 46 (E.D.N.Y. 2009)) (internal
quotation marks omitted). "In 'garden variety' emotional distress claims, the evidence of mental
suffering is generally limited to the testimony of the plaintiff, who describes his or her injury in
vague or conclusory terms, without relating either the severity or consequences of the injury."
*Olsen*, 615 F. Supp. 2d at 46 (internal quotation marks omitted). "Such claims typically lack

extraordinary circumstances and are not supported by any medical corroboration." *Id.* (internal quotation marks and alteration omitted).

In contrast, "significant" emotional distress claims "are based on more substantial harm or more offensive conduct, are sometimes supported by medical testimony and evidence, evidence of treatment by a healthcare professional and/or medication, and testimony from other, corroborating witnesses." *Id.* at 46-47 (internal quotation marks omitted). "Egregious" emotional distress claims generally involve "either outrageous or shocking discriminatory conduct or a significant impact on the physical health of the plaintiff." *Id.* at 47 (internal quotation marks omitted); *e.g.*, *Caravantes v. 53rd Street Partners, LLC*, No. 09 Civ. 7821, 2012 WL 3631276, at *22–23 (S.D.N.Y. Aug. 23, 2012) (employee subjected to unwanted sexual acts suffered "significant" emotional distress where harassment led to social isolation, trouble sleeping, sexual dysfunction, marital problems, depressive disorder, post-traumatic stress disorder, and hospital admission for suicidal ideation; plaintiff's testimony was corroborated by wife and treating psychologist); *Thorsen v. Cty. of Nassau*, 722 F. Supp. 2d 277, 292 (E.D.N.Y. 2010) (emotional distress was not "garden variety" where plaintiff saw therapist twice weekly for six months, and both plaintiff and therapist testified at length regarding Plaintiff's anxiety and depression, physical symptoms, and "major stress attack" requiring hospitalization).

This case falls in the "garden variety" category.[5]  One witness testified about Vera's emotional distress: Vera herself.  She testified that, after losing her job, she was "not the same person," "lost self-esteem," was "very hurt," "ashamed," "changed," and concerned about what people would think of her.  Tr. 154.  She "didn't get out of the house for many months."  *Id.*  She found it difficult to communicate the news to her adult children.  *See id.* 155-56.  She was "very

---

[5] By use of the term "garden variety," the Court does not mean to trivialize Ms. Vera's emotional distress.  The Court uses the term only to contextualize this case within the applicable case law.

unhappy" and felt like she lost "professional respect" and "status businesswise." *Id.* 157.  On a

trip to Chile, Vera's family members observed that she was not as "friendly and happy[.]" *Id.*

Vera said that she sometimes cried while talking to employers during her job search.  *See id.* 159.

She lost pride, and felt like her "professional career was a failure" because she "didn't get to

retire." *Id.* 162.  Finally, she testified that she visited a psychiatrist "[a]bout ten times" over a

four-year period, was prescribed Prozac until she stopped taking it in late 2013, and saw a

psychologist "[a]bout ten times." *See id.* 158-59.  She did not corroborate this testimony with

any medical evidence.

The Court concludes that Vera's emotional distress is "garden variety" because the

evidence was limited to her own testimony, describing her emotional distress in general and

conclusory terms, offering no proof of permanent injury or physical impact, and without

corroborating testimony, medical or otherwise.  *See, e.g.*, *Johnson v. Strive E. Harlem Emp't*

*Grp.*, 990 F. Supp. 2d 435, 456-57 (S.D.N.Y. 2014) (plaintiff proved "garden variety" emotional

distress "at best" where she relied on her own testimony regarding her emotional reaction to

racial epithets and sexual harassment at work, her loss of energy and confidence, crying,

becoming a less effective parent, having trouble sleeping, and seeing two therapists; plaintiff

offered no corroborating testimony, nor any evidence of physical manifestations of her distress);

*Abel v. Town Sports Int'l, LLC*, No. 09 Civ. 10388 (DF), 2012 WL 6720919, at *16 (S.D.N.Y.

Dec. 18, 2012) (finding "garden variety" emotional distress where plaintiff offered evidence,

corroborated by other witnesses, that he was hurt, stressed, "not himself," and gained weight);

*MacMillan v. Millennium Broadway Hotel*, 873 F. Supp. 2d 546, 561 (S.D.N.Y. 2012)

(plaintiff's testimony that his work environment was "horrible" because of racial harassment,

and daughter's testimony that plaintiff was "always sad" and "wasn't his same self," without

evidence of physical manifestations or disruption of daily life, demonstrated "garden variety" emotional distress "at best").

This Court has applied similar principles in evaluating jury awards under CFEPA. *Cf. Stampf*, 761 F.3d at 204 (in determining whether remittitur is appropriate as to state law award, district court "refer[s] to federal standards developed under Rule 59"). In *McInnis v. Town of Weston*, 458 F. Supp. 2d 7, 12-13, 15-16 (D. Conn. 2006), a police officer prevailed on his CFEPA claim that the Town of Weston retaliated against him for making an age discrimination complaint by suspending him twice without pay. The plaintiff testified that "his experience at work was extremely unpleasant, stressful, and fraught with uncertainty[,]" he feared for his safety because a fellow officer threatened to deny him backup, he felt like "persona non grata" at work, felt inadequate, had eight sessions with a counselor, became withdrawn from his family, stopped coaching and attending his kids' softball games, and had trouble sleeping. *Id.* at 16.

This Court reviewed Connecticut case law, which showed that "[c]ases meriting larger non-economic damages awards are those in which plaintiffs suffered more than 'garden variety' signs of emotional distress, often including physical symptoms; and their testimony was corroborated by other witnesses." *Id.* at 17 (citing *Gaudio v. Griffin Health Servs. Corp.*, 249 Conn. 523, 551 (1999) and *Oakes v. New Eng. Dairies, Inc.*, 219 Conn. 1, 5–6 (1991)). The Court held that, "even considering to the fullest extent the nature and duration of plaintiff's emotional distress," the jury's $860,000 non-economic damages award was "clearly excessive and indeed shocks the Court's sense of justice." *Id.* at 17-18. The Court ordered a new trial unless the plaintiff accepted a remittitur to $150,000. *Id.* at 19.

Similarly, in *Schanzer v. United Techs. Corp.*, 120 F. Supp. 2d 200, 202 (D. Conn. 2000), two financial analysts prevailed on their CFEPA claims that Pratt & Whitney terminated them on

the basis of age.  The plaintiffs offered only their own testimony as to "their feelings of hurt, shock, disorientation, embarrassment and the distress they suffered at the loss of their careers after such a lengthy tenure[.]"  *Id.* at 217.

Observing that "Connecticut courts have remitted emotional distress awards where there was no proof of permanent injury and the damages award was disproportionate to the loss sustained[,]" the Court found remittitur appropriate because, *inter alia*, "the only evidence regarding the nature or degree of the emotional distress [plaintiffs] suffered was their own subjective testimony. . . . There was no evidence of workplace mistreatment or humiliation. They were laid off, not terminated for individual performance deficiencies.  No somatic manifestations of distress or behavioral changes were described, and there was no evidence of serious or traumatic consequences or impact on the plaintiffs' family or personal relationships." *Id.* at 217-19.  The Court concluded that the jury's $175,000 awards to each Plaintiff shocked the judicial conscience, and ordered remittitur to $40,000 for one plaintiff and $45,000 for the other. *Id.* at 219-20.

The Court finds guidance in *McInnis* and *Schanzer*, as well as the Connecticut cases relied on in those decisions, such as *Gaudio* and *Oakes*.  In *Gaudio*, the Connecticut Supreme Court upheld a jury's award of $100,000 in non-economic damages to a plaintiff who was "emotionally devastated" after his employer wrongfully terminated and defamed him.  *Gaudio*, 249 Conn. at 550-52.  He became depressed, experienced financial difficulty, "a romantic relationship terminated, and [he] lost a substantial amount of weight."  *Id.* at 552.

In *Oakes*, the Connecticut Supreme Court held that a $97,500 non-economic damages award was not excessive where the plaintiff was terminated in retaliation for utilizing workers' compensation, suffered stomach pains, passed out twice, was prescribed anti-depressant

medication, and undertook a four-year job search but did not find a position with equivalent pay. *Oakes*, 219 Conn. at 3-6, 13-15.  "Given the plaintiff's age, the emotional and physical effects of his discharge and his endurance of a prolonged period of uncertainty as to his future financial security," the court concluded that the $97,500 award was "not so large as to shock th[e] court's sense of justice or to compel the conclusion that the jury was influenced by partiality, prejudice, mistake or corruption."  *Id.* at 15.

More recently, the Connecticut Supreme Court held that a jury's $94,500 non-economic damages award was "not excessive or shocking when compared to verdicts awarded under similar circumstances."  *Patino v. Birken Mfg. Co.*, 304 Conn. 679, 708 & n.26 (2012) (citing six federal cases, including *Olsen*, 615 F. Supp. 2d at 46 ("[g]arden variety emotional distress claims generally merit $30,000 to $125,000 awards")).  The plaintiff in *Patino*, whose coworkers harassed him for years on the basis of his sexual orientation, testified that he was "devastated and overwhelmed by anger and by frustration and the humiliation resulting from the harassment.  He testified that the demeaning treatment made him so upset that his body would shake, his work product suffered, and it became difficult for him to sleep."  *Id.* at 683-84 (internal quotation marks omitted).

Upon review of these authorities, the Court concludes that the $500,000 non-economic damages award in this case is plainly excessive, out of line with awards in similar federal and state cases, and shocks the judicial conscience under the federal and state standards.  The evidence was limited to Vera's own testimony, which described her distress in general and conclusory terms, did not reveal any permanent or somatic injury, and was not corroborated by any medical or other testimony.  Vera was laid off (not fired), and did not suffer workplace hostility or lose any personal relationships.

Accordingly, the Court orders a new trial on damages unless Vera agrees to remit the award to $125,000, which is near the top of the range in "garden variety" emotional distress cases, and thus reflects the jury's view that Vera's distress was considerable.  *See Graham*, 128 F. Supp. 3d at 715 (noting, in 2015, that a $150,000 award for "garden variety" emotional distress was "at the higher end of reasonable awards"); *Bouveng v. NYG Capital LLC*, No. 14 Civ. 5474 (PGG), 2016 WL 1312139, at *44 (S.D.N.Y. Mar. 31, 2016) (remitting $500,000 emotional distress award on *quid pro quo* sexual harassment claim to $150,000, which was "the maximum that [could] be upheld . . . as not excessive" where plaintiff's testimony about her emotional distress was "vague or conclusory" and offered no medical corroboration), *appeal docketed*, No. 16-1376 (2d Cir. Apr. 29, 2016); *Stevens v. Rite Aid Corp.*, No. 6:13-CV-783, 2015 WL 5602949, at *22 (N.D.N.Y. Sept. 23, 2015) (remitting $900,000 award to $125,000, which was "at the higher end of the range of reasonable verdicts for garden variety emotional distress claims"), *appeal docketed*, No. 15-3491 (2d Cir. Oct. 30, 2015); *Watson v. E.S. Sutton, Inc.*, No. 02 Civ. 2739 (KMW), 2005 WL 2170659, at *1 (S.D.N.Y. Sept. 6, 2005) (remitting $500,000 "garden variety" emotional distress award to $120,000 where plaintiff prevailed on retaliation claims under Title VII and New York state statute), *aff'd*, 225 F. App'x 3 (2d Cir. 2006); *Patterson v. Balsamico*, 440 F.3d 104, 120 (2d Cir. 2006) (noting that Second Circuit has sustained award of $125,000 for subjective distress not accompanied by medical treatment).

### b.    Punitive Damages

Alstom argues that the Court should set aside the $350,000 punitive damages award as unsupported by the evidence, or reduce it.  The Court will not set aside the punitive award *in toto*, but does order a new trial on damages unless Vera agrees to remit the award to $50,000.

The jury awarded punitive damages under Title VII only.  *See Tomick v. United Parcel Serv., Inc.*, 157 Conn. App. 312, 341 (2015) (punitive damages are not recoverable under CFEPA).  Punitive damages are appropriate under Title VII if the defendant "engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual."  42 U.S.C. § 1981a(b)(1).  Malice and reckless indifference refer to "the employer's knowledge that it may be acting in violation of federal law, not its awareness that it is engaging in discrimination."  *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 535 (1999).  "[A]n employer must at least discriminate in the face of a perceived risk that its actions will violate federal law to be liable in punitive damages."  *Id.* at 536.  The Court instructed the jury accordingly.  Tr. 691.

Alstom argues that the punitive damages award cannot stand because Vera did not establish more than mere liability.  *See Wiercinski*, 787 F.3d at 115 ("The showing required for an award of punitive damages is not the same as that required for liability.").  Specifically, Alstom argues that it did not act in a manner that demonstrates malice or reckless indifference, as evidenced by the fact that it laid off Vera (rather than fire her), gave her one year's salary as separation pay, gave her a prorated bonus, and allowed her to submit late reimbursement requests worth about $30,000.  *See* Def.'s Mem. at 35-36.

But the critical determination is Alstom's state of mind when it decided to terminate Vera.  *See Kolstad*, 527 U.S. at 535 ("The terms 'malice' and 'reckless' ultimately focus on the actor's state of mind.").  If Alstom decided to terminate Vera because of her CHRO complaint, and did so in the face of a perceived risk that its actions would violate federal law, then punitive damages are appropriate, regardless of the terms of her separation.

The jury reasonably could have found, in view of Alstom's size and sophistication, that the relevant decision-makers received employment discrimination training, or otherwise were aware of federal law's well-established prohibition against retaliation. *See* Tr. 412, 523; *Zimmermann v. Assocs. First Capital Corp.*, 251 F.3d 376, 385 (2d Cir. 2001) (training in equal opportunity conveys awareness of Title VII requirements); *Hill v. Airborne Freight Corp.*, 212 F. Supp. 2d 59, 76 (E.D.N.Y. 2002) ("Arguably, it was reasonable for the jury to infer that [defendant's] managers knew that their actions were in violation of federal law simply by virtue of the well-established Supreme Court case law on discrimination and retaliation, the long standing statutory schemes proscribing such conduct, the size of [defendant company], and the common knowledge in today's society that employment discrimination is impermissible."); *see also DiMarco–Zappa v. Cabanillas*, 238 F.3d 25, 38 (1st Cir. 2001) ("The extent of federal statutory and constitutional law preventing discrimination . . . suggests that defendants had to know that such discrimination was illegal."); *Molnar v. Booth*, 229 F.3d 593, 604 (7th Cir. 2000) (punitive damages were appropriate because "[t]he events here took place in 1994, long after the law of sexual harassment had become well established by the Supreme Court").

Moreover, the jury reasonably could have found that Alstom's proffered reason for terminating Vera – reducing head count – was pretext, and, in turn, that Alstom tried to mask its retaliation because it knew that retaliation violates federal law. *See Connolly v. Bidermann Indus. U.S.A., Inc.*, 56 F. Supp. 2d 360, 369 (S.D.N.Y. 1999) (evidence supported punitive damages award where jury rejected employer's proffered reasons as pretext, and employer terminated plaintiff without engaging in interactive process). Indeed, while Alstom argues that a generous severance package demonstrates a lack of malice, a reasonable jury could construe the same evidence to reflect a knowing attempt to minimize the risk of a spurned employee

enforcing her violated rights.

The Court properly instructed the jury on the law with respect to punitive damages under Title VII, and Alstom does not challenge those instructions.  *Cf. Jarvis v. Ford Motor Co.*, 283 F.3d 33, 57 (2d Cir. 2002) ("[F]ailure to object to a jury instruction . . . results in a waiver of that objection").  After considering the evidence and assessing witnesses' credibility through observation, the jury concluded that Alstom acted with malice or reckless indifference, a factual finding uniquely within the province of the jury, and supported by the record.  Accordingly, the Court will not disturb the jury's determination that punitive damages are warranted.

The Court does, however, conclude that the $350,000 punitive award shocks the judicial conscience, and orders a new trial on damages unless Vera agrees to remit the award to $50,000.

"Judicial review of the size of punitive damages awards has been a safeguard against excessive verdicts for as long as punitive damages have been awarded."  *Honda Motor Co. v. Oberg*, 512 U.S. 415, 421 (1994).  Courts must ensure that punitive damages awards "conform, insofar as reasonably practicable, to the prevailing norms of the legal system and are not excessive."  *Stampf*, 761 F.3d at 209 (internal quotation marks and alteration omitted).

The Supreme Court outlined three guideposts to consider when reviewing state court punitive damage awards: (1) the degree of reprehensibility of the defendant's conduct; (2) the ratio of punitive damages to the actual harm inflicted; and (3) the difference between the punitive damages remedy and the civil penalties authorized or imposed in comparable cases.  *BMW of N. Am. Inc. v. Gore*, 517 U.S. 559, 574-75 (1996).  These guideposts "provide a useful framework for reviewing federal district court punitive damages awards" as well.  *Stampf*, 761 F.3d at 209.

But "even where the punitive award is not beyond the outer constitutional limit marked out, however imprecisely, by the three *Gore* guideposts," the Court must "review punitive

awards for excessiveness . . . [which] requires comparison with awards approved in similar cases

. . . [and] determin[ing], as with compensatory awards, whether the punitive award is so high as

to shock the judicial conscience and constitute a denial of justice." *Mathie v. Fries*, 121 F.3d

808, 816-17 (2d Cir. 1997) (internal quotation marks and citation omitted); *accord Payne v.*

*Jones*, 711 F.3d 85, 97 (2d Cir. 2013) (federal court need not find that award violated due

process to set it aside as excessive).

Of the three guideposts, the "most important" is "the degree of reprehensibility of the

defendant's conduct." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 419 (2003).

The Supreme Court enumerated five factors to consider when evaluating reprehensibility: (1)

whether the harm caused was physical as opposed to economic; (2) whether the tortious conduct

evinced an indifference to or a reckless disregard of the health or safety of others; (3) whether

the target of the conduct had financial vulnerability; (4) whether the conduct involved repeated

actions or was an isolated incident; and (5) whether harm was the result of intentional malice,

trickery, or deceit, or mere accident. *Id.*

Here, the Court finds little to no reprehensibility.  Alstom did not subject Vera to hostility

or harassment in the workplace, caused no threat or harm to Vera's health or safety, and did not

engage in repeated misconduct.  Vera's harm was mostly economic, and the evidence did not

show her to be financially vulnerable.  Moreover, Alstom gave Vera one year's salary as

separation pay, a prorated bonus, and overdue reimbursements upon her departure. *See, e.g.*,

*Fernandez v. N. Shore Orthopedic Surgery & Sports Med., P.C.*, 79 F. Supp. 2d 197, 207-08

(E.D.N.Y. 2000) (finding low degree of reprehensibility where defendant's conduct was not

violent, threatening, or repeated); *Tse v. UBS Fin. Servs., Inc.*, 568 F. Supp. 2d 274, 313

(S.D.N.Y. 2008) (finding low degree of reprehensibility where defendant's actions were not

violent or threatening, there was little evidence of malice or deceit, and defendant did not engage in repeated misconduct).

The second guidepost looks at the ratio of punitive damages to the actual harm inflicted. *Gore*, 517 U.S. at 580-83.  After remitting the non-economic damages award to $125,000, and adding the $475,345.65 in back pay awarded *infra*, *see Cioffi v. N.Y. Cmty. Bank*, 465 F. Supp. 2d 202, 214 (E.D.N.Y. 2006) (in calculating ratio, court may consider Title VII back pay award as part of actual harm suffered by plaintiff), the ratio is nearly 1:2, which does not "raise a suspicious judicial eyebrow[,]" *see Stampf*, 761 F.3d at 211 (quoting *Gore*, 517 U.S. at 582).

The third guidepost looks at the difference between the punitive damages remedy and the civil penalties authorized or imposed in comparable cases.  *Gore*, 517 U.S. at 583-85.  Here, Title VII caps punitive and compensatory damages at $300,000.  42 U.S.C. §1981a(b)(3)(D). Thus, the $350,000 punitive damages award is not within the bounds of Title VII.  Moreover, punitive damages are not available under CFEPA.  *Tomick*, 157 Conn. App. at 341.

Upon consideration of the *Gore* guideposts, the Court concludes that the low "degree of reprehensibility of the defendant's conduct . . . strongly suggests that the punitive award of $3[5]0,000 was excessive[.]"  *Payne*, 711 F.3d at 104.  The Court now turns to awards in other cases.  *See id.* at 104-05 (examining awards in similar cases after *Gore* analysis, and collecting cases); *Mathie*, 121 F.3d 808, 817 (2d Cir. 1997) (reviewing punitive damages award for excessiveness "requires comparison with awards approved in similar cases").

At the outset, the Court notes that "[c]ases upholding punitive damage awards of $200,000 or more generally involve discriminatory or retaliatory termination resulting in severe financial vulnerability to plaintiff, repeated incidents of misconduct over a significant period of time, repeated failures to address complaints of discrimination, and/or deceit."  *MacMillan*, 873

27

F. Supp. 2d at 566 (collecting cases).  As noted *supra*, those conditions are not present here.

Furthermore, the punitive award in this case is greater than awards issued in cases involving more reprehensible conduct.  For example, in *Luciano v. Olsten Corp.*, 110 F.3d 210, 221-22 (2d Cir. 1997), the Second Circuit affirmed a district court's remittitur of a $5 million punitive award to the Title VII cap of $300,000 where there was "ample evidence" to support a finding of malice or reckless indifference, including, *inter alia*, testimony that the plaintiff was called a "bitch" at an official business function.  In *Mathie*, the Second Circuit reduced a punitive award from $500,000 to $200,000 where the defendant repeatedly sexually abused and sodomized an inmate in his custody.  *Mathie*, 121 F.3d at 816-17.

More recently, the Second Circuit remitted an "excessive" $300,000 punitive award to $100,000 where the defendant police officer verbally taunted and physically assaulted the plaintiff.  *Payne*, 711 F.3d at 101, 106.  Even more recently, the Second Circuit remitted an "excessive" $150,000 punitive award to $100,000 where the defendant made false statements to police accusing the plaintiff of touching her breast, resulting in the plaintiff's arrest in front of coworkers, spending a night in prison, and experiencing embarrassment and stress contributing to alcohol abuse problems and the end of a "long-term, committed relationship."  *Stampf*, 761 F.3d at 210-11.  The Second Circuit held that the jury's punitive award of $150,000 was "excessive in relation to the reprehensibility of [the defendant's] conduct" and that "$100,000 [was] the maximum sustainable punitive award."  *Id.*; *see also, e.g.*, *Manzo v. Sovereign Motor Cars, Ltd.*, No. 08-CV-1229 (JG) (SMG), 2010 WL 1930237, at *5 (E.D.N.Y. May 11, 2010) (upholding $200,000 punitive damage award where Title VII plaintiff's supervisor engaged in repeated instances of sexual harassment, intentionally manipulating the terms of her employment to pursue a romantic relationship with her and penalize her when she spurned his advances;

plaintiff was in a precarious financial situation that her supervisor knew about and used to his advantage); *MacMillan*, 873 F. Supp. 2d at 566-69 (remitting $1 million punitive award to $100,000 under Title VII where black plaintiff's coworker hung a black voodoo doll from a bulletin board with a noose around its neck, and coworkers uttered a racial epithet in his presence); *Mahoney v. Canada Dry Bottling, Co.*, No. 94–CV–2924 (FB), 1998 WL 231082, at *7-9 (E.D.N.Y. May 7, 1998) (remitting "excessive" $650,000 punitive damages award to $100,000 where, because of plaintiff's filing a charge of discrimination, manager exhibited overt hostility toward plaintiff, instructed another manager to treat plaintiff differently, and failed to investigate plaintiff's complaint); *DeCurtis v. Upward Bound Intern., Inc.*, No. 09 Civ. 5378 (RJS), 2011 WL 4549412, at *1, 5 (S.D.N.Y. 2011) (awarding $75,000 in punitive damages on plaintiff's sex discrimination and retaliation claims where supervisor repeatedly touched plaintiff in a sexual manner without her consent, sent plaintiff sexually explicit e-mails and made sexually explicit comments, and threatened her job when she complained).

Courts in the Second Circuit have remitted punitive damages awards to modest sums below $100,000 in cases where, as here, reprehensible conduct was lacking.  *See, e.g.*, *Chisholm v. Memorial Sloan-Kettering Cancer Ctr.*, 824 F. Supp. 2d 573, 580 (S.D.N.Y. 2011) (remitting $1 million punitive award to $50,000 in retaliation case where defendant's conduct did not involve violence, threats, racial slurs, or other offensive language, and noting that "an award of $50,000 is more in line with the punitive damages awarded in similar cases by this Court and other courts in this Circuit."); *Norris v. N.Y.C. Coll. of Tech.*, No. 07-CV-853, 2009 WL 82556, at *7-8 (E.D.N.Y. Jan. 14, 2009) (remitting jury's $425,000 punitive damage award to $25,000 in retaliation case, and reasoning that, "[w]hile the evidence supports the conclusion that [plaintiff's supervisor] acted intentionally and with knowledge that his conduct would violate

[plaintiff's] rights, no other indicia of reprehensibility are present.  There was no violence or threat of violence.  Nor was there any evidence of repeated misconduct[.]"); *Lamberson v. Six W. Retail Acquisition, Inc.*, No. 98 Civ. 8053, 2002 WL 59424, at *6–8 (S.D.N.Y. Jan. 16, 2002) (remitting $375,000 punitive damage award to $30,000 in retaliation case where there was no violence, threats, deceit, malice, or history of misconduct); *Fernandez*, 79 F. Supp. 2d at 207-08 (concluding that "the maximum award of punitive damages that would not be excessive is $50,000" after finding a low degree of reprehensibility because defendant's conduct was not violent, threatening, or repeated, and noting that "[i]n comparison with other civil penalties for similar conduct, the [$100,000] punitive damages award in this case appears excessive"); *Kim v. Dial Serv. Int'l, Inc.*, No. 96 Civ. 3327 (DLC), 1997 WL 458783, at *14-15 (S.D.N.Y. Aug. 11, 1997) (remitting $725,000 punitive damages award to $25,000 where degree of reprehensibility was low because "there was no violence and very little repetition of the misconduct"), *aff'd*, 159 F.3d 1347 (2d Cir. 1998); *Iannone v. Harris, Inc.*, 941 F. Supp. 403, 413–15 (S.D.N.Y. 1996) (remitting $250,000 punitive award to $50,000 where jury rejected claims of sexual harassment but found retaliatory discharge; plaintiff's supervisor required her to prepare presentation slide using original page from *Playboy* magazine which contained image of nude woman, and terminated her in retaliation for expressing concern).

In view of the low degree of reprehensibility of Alstom's conduct, and the disparity between the award in this case and awards in similar cases, the maximum award of punitive damages that would not be excessive is $50,000.  Accordingly, the Court orders a new trial on damages unless Vera agrees to remit the punitive award to that amount.

### B.    Back Pay

When an employer violates Title VII, a court may award back pay to make the employee whole.  42 U.S.C. § 2000e-5(g)(1); *Clarke v. Frank*, 960 F.2d 1146, 1151 (2d Cir. 1992).  Back

pay awards are designed to compensate for "what the employee . . . would have earned had [s]he not been discharged." *Kirsch*, 148 F.3d at 166.  Under Title VII, an award of back pay "is the rule, not the exception." *Carrero v. N.Y.C. Hous. Auth.*, 890 F.2d 569, 580 (2d Cir. 1989).

An employer may avoid a back pay award, however, if it demonstrates that the plaintiff failed to mitigate her damages.  *Broadnax*, 415 F.3d at 268.  "This may be done by establishing (1) that suitable work existed, and (2) that the employee did not make reasonable efforts to obtain it."  *Id.* (quoting *Dailey v. Societe Generale*, 108 F.3d 451, 456 (2d Cir. 1997)).  But an employer "is released from the duty to establish the availability of comparable employment if it can prove that the employee made no reasonable efforts to seek such employment."  *Greenway v. Buffalo Hilton Hotel*, 143 F.3d 47, 54 (2d Cir. 1998).

Alstom argues that Vera cannot recover back pay because she failed to mitigate her damages.  The Court finds, however, that Alstom did not prove that Vera failed to make reasonable efforts to seek comparable or suitable employment.

The employer bears the burden to show that the plaintiff did not make reasonable efforts to seek alternative employment.  *Broadnax*, 415 F.3d at 270.  In determining whether the employer met that burden, the Court asks whether the plaintiff "use[d] reasonable diligence in finding other suitable employment, which need not be comparable to their previous positions." *Greenway*, 143 F.3d at 53 (internal quotation marks omitted).  "The ultimate question is whether the plaintiff acted reasonably in attempting to gain other employment or in rejecting proffered employment."  *Hawkins v. 1115 Legal Serv. Care*, 163 F.3d 684, 695 (2d Cir. 1998) (internal quotation marks omitted).  "This obligation is not onerous and does not require her to be successful."  *Id.*  For example, although a plaintiff generally forfeits her right to back pay if she refuses a job substantially equivalent to the one she lost, she "need not go into another line of

work, accept a demotion, or take a demeaning position[.]"  *Ford Motor Co. v. E.E.O.C.*, 458 U.S. 219, 231-32 (1982).

Alstom essentially argues that Vera's failure to mitigate is evidenced by the following: (1) after more than four years of alleged searching, Vera, a project manager with decades of experience and confidence in her skills, has not found work; (2) Vera was near retirement age when she was terminated, and her true intention was to retire, not seek re-employment; and (3) there are significant stretches of time for which Vera did not produce documentation of her job search.  *See* Def.'s Opp. to Pl.'s Br. on Econ. Damages at 10-15; Def.'s Suppl. Submission on Pl.'s Econ. Damages at 1-5.

As to the first point, the Court's focus is on Vera's efforts to find comparable employment, not whether those efforts were successful.  *Hawkins*, 163 F.3d at 695 (plaintiff's duty to mitigate is "not onerous and does not require her to be successful").  Alstom cites no authority, and the Court found none, standing for the proposition that a years-long failure to find comparable employment compels a finding of a failure to search reasonably.  *See Dailey*, 108 F.3d at 456 ("[A]n assessment of the reasonableness of a plaintiff's effort to mitigate encompasses more than a simple review of the duration of his or her job search").

As to the second point, Alstom relies on a non-binding case for the proposition that Vera "is required to prove when she would have retired," and maintains that Vera's true intention was to retire upon her termination.  *See* Def.'s Opp. to Pl.'s Br. on Econ. Damages at 12-13 (citing *Finch v. Hercules Inc.*, 941 F. Supp. 1395, 1420 (D. Del. 1996)).  First, the *Finch* court held that a plaintiff bore the burden to prove when he would have retired in the context of proving the amount of his damages, not whether he made reasonable efforts to find other employment.  *See Finch*, 941 F. Supp. at 1418-20.  The court addressed mitigation separately, without discussing

when the plaintiff would have retired.  *See id.* at 1421.  Second, this Court reiterates the focus of

the mitigation inquiry.  It is Alstom's burden to show that Vera did not make reasonable efforts

to seek alternative employment.  *See Broadnax*, 415 F.3d at 270.  Estimating when Vera would

have retired might be relevant in determining front pay.  But on the concrete question of what

Vera actually did to find a job, the Court sees little value in prognostication.

Alstom's third point is well taken.  There are significant stretches of time for which Vera

did not produce documentation of her job search.  For example, from the date of her termination

through April 15, 2012, a period of 290 days, Vera produced only one record – a July 2011

e-mail in which she declined a long-term assignment in Spain because she had family

commitments and previously-planned vacation.  *See* Def.'s Suppl. Submission on Pl.'s Econ.

Damages at 3; Pl.'s Ex. 66.  She indicated in that e-mail, however, that she would consider

covering for other people for short durations, and would send her curriculum vitae for future

consideration.  Pl.'s Ex. 66.  Another example is a 192-day period from November 9, 2013

through May 19, 2014 for which Vera produced no documentation of her job search.  Def.'s

Suppl. Submission on Pl.'s Econ. Damages at 4.  Shorter periods for which Vera produced no

documentation are scattered throughout the time since her termination.  *See id.* at 3-5.  Moreover,

Vera lost some credibility, in the Court's view, for failing to document and disclose fully her

search efforts in response to Alstom's discovery requests.

Mindful, however, that Vera's duty to mitigate is "not onerous," *Hawkins*, 163 F.3d at

695, the Court will not place undue weight on recordkeeping.  Vera testified credibly that she did

not document each Internet search, conversation with a recruiter or colleague, visit to an

outplacement center, and "networking" effort that she made, and Alstom did not prove that, on

the days for which Vera produced no documentation, she did not pursue employment through those avenues.

The evidence showed that, after her termination in June 2011, Vera told former colleagues that she was looking for work, and asked them to be references.  In January 2012, Vera started using the services of an outplacement center.  She testified that she waited six months to go to the center because she was emotional in the months following her termination, and had difficulty talking about her employment situation without crying.

With help from staff at the outplacement center, Vera, who had worked at only one place her entire career (Alstom and its predecessors), developed a résumé for the first time.  Vera took advantage of the center's interview training programs, and lectures on Internet job search tools.

Vera initially targeted project manager positions with comparable compensation at energy companies within a couple hours' commute of her home in Connecticut.  *See Bergerson v. N.Y. State Office of Mental Health, Cent. N.Y. Psychiatric Ctr.*, 526 F. App'x 109, 111 (2d Cir. 2013) ("The long-settled rule in the labor area is that a wrongfully discharged employee need not accept, in mitigation of damages, employment that is located an unreasonable distance from [her] home.") (internal quotation marks omitted).  Beginning in April 2012, she applied for between five and seven positions at Babcock, a competitor of Alstom's.  She interviewed at Babcock in early 2015, but did not receive an offer.  Vera also applied to two project manager positions at Alstom, but did not receive interviews.  Finally, she applied for project manager positions at a power company in Massachusetts, Northeast Utilities, Burns and McDonnell, and Siemens.  Handwritten notes and e-mails that Vera submitted reveal even more comparable positions that she applied to or investigated.  *See* Pl.'s Exs. 67-70.

In or about late 2012, Vera expanded her search to project manager positions in other industries, such as insurance and construction. *See, e.g.*, Pl.'s Ex. 69d. She also applied for positions in New York and New Jersey, outside of her initial geographic search region, with the intention of staying at a hotel during the work week if she secured a position. Over the course of her search, Vera had several telephonic interviews and three in-person interviews. She received no offers. *Contra Ford Motor Co.*, 458 U.S. at 231-32 (employee forfeits right to back pay if she refuses job substantially equivalent to the one she lost). Vera testified in May 2015 that she was still looking for work, and that, since starting her search, she had not been unavailable for work, and had not ceased her efforts.

On this record, the Court cannot conclude that Vera failed to mitigate her damages. Alstom's presentation focused mostly on the documentation of Vera's search efforts. But, in view of the testimonial and documentary evidence that was submitted, the Court is not persuaded that Vera's efforts, however poorly documented, were insufficient. Vera undertook her first job search in decades, created a résumé, educated herself on interview and job search techniques, applied to a number of comparable positions, had interviews, and adjusted her expectations in terms of geography and industry when her efforts yielded no results. Apart from a long-term opportunity in Spain shortly after her termination, which conflicted with prior commitments, she did not turn down any offers of employment, and did not cease her search efforts. *Contra Hine v. Mineta*, 238 F. Supp. 2d 497, 500-01 (E.D.N.Y. 2003) (air traffic control trainee failed to mitigate damages because she left her job at the age of twenty-eight, never attempted to work again as an air traffic control trainee, moved to Marco Island, Florida, and her only attempt to find work over a seven-year period was a three-month clerical position). Because Alstom did not prove that Vera failed to mitigate her damages, the Court will award back pay.

### 1.      Salary

Vera is entitled to back pay from the date of her termination until the date this Court

enters judgment on back pay.  *See Saulpaugh v. Monroe Cmty. Hosp.*, 4 F.3d 134, 144-45 (2d

Cir. 1993) ("Given [plaintiff]'s success on her claim for retaliatory discharge, she would

ordinarily be entitled to an award of back pay from the date of her termination until the date of

judgment."); *Banks v. Travelers Cos.*, 180 F.3d 358, 364 (2d Cir. 1999) ("[A]ny lag time

between the jury's verdict and the district court's ultimate judgment ordinarily should be

remedied by the court, in the form of a pro rata increase of the back pay award."); *Sands v.

Runyon*, 28 F.3d 1323, 1328 (2d Cir. 1994) (back pay should have been awarded through the

date of judgment); *Harding v. Cianbro Corp.*, 498 F. Supp. 2d 337, 339 (D. Me. 2007) (awarding

back pay for period between jury verdict and reinstatement) (citing *Banks*, 180 F.3d at 364).

As noted above, an award of back pay is based on "what the employee . . . would have

earned had [s]he not been discharged."  *Kirsch*, 148 F.3d at 166 (emphasis added).  It should

include "lost salary, including anticipated raises, and fringe benefits."  *Saulpaugh*, 4 F.3d at 145;

*accord Equal Emp't Opportunity Comm'n v. Kallir, Philips, Ross Inc.*, 420 F. Supp. 919, 923

(S.D.N.Y. 1976) (plaintiff entitled to "back pay from the date of discharge to the present,

including such increases, if any, as she would have received within that period"), *aff'd*, 559 F.2d

1203 (2d Cir. 1977).

At the time of her termination, Vera's base salary was $118,194.62.  Joint Stmt. ¶ 1, ECF

No. 177.  The parties dispute whether Vera's salary would have increased had she not been

denied a performance evaluation in March 2011, and later terminated.

The jury found that Alstom violated Title VII and CFEPA when it "denied plaintiff a

2010 performance evaluation and thereby denied her a raise on or about March 31, 2011[.]"

Verdict at 1.  Vera argues that "the jury expressly found that Alstom violated Title VII and

CFEPA by denying Ms. Vera a raise in March 2011." Pl.'s Reply at 2. Alstom reads the verdict differently, and maintains that, "[a]lthough the jury determined that Alstom's decision not to review plaintiff's performance in 2011 was retaliatory, it does not necessarily follow that she actually would have been given a raise in that year or any year thereafter. At most, the jury's verdict means that plaintiff was impermissibly denied the opportunity to be considered for a raise." Def.'s Opp. to Pl.'s Br. Econ. Damages at 4.

The word "thereby" in the jury's finding does raise a question as to whether the jury found that Vera would have received a raise but for Alstom's retaliation. The finding could be read to suggest only that the denial of a performance evaluation necessarily resulted in the denial of consideration for a raise, not that Vera deserved a raise. *See also* Am. Joint Trial Memo. at 4 (Vera identifying as adverse employment action "[t]he decision to not give her a performance evaluation or rating in March 2011 and resultant denial of a raise").

Nonetheless, the Court concludes that Vera is entitled to raises. *See Saulpaugh*, 4 F.3d at 145 (plaintiff who succeeds on claim for retaliatory discharge is entitled to back pay award that completely redresses her economic injury, and "should therefore consist of lost salary, including anticipated raises, and fringe benefits.").

At minimum, the jury found that Alstom retaliated against Vera by denying her a performance evaluation, and that, as a result, Vera was denied consideration for a raise. Alstom should not benefit from any doubt as to whether Vera would have received a raise had she not unlawfully been denied consideration for one. *See JPMorgan Chase Bank v. Liberty Mut. Ins. Co.*, 189 F. Supp. 2d 24, 28 (S.D.N.Y. 2002) (noting, in another context, the "familiar equitable principle that a wrongdoer, whether willful or negligent, should not benefit from his own wrongdoing"); *Dailey*, 108 F.3d at 461 ("[A]s between conferring windfall to victim of

wrongdoing and wrongdoer, victim is the 'logical choice'") (quoting *Hunter v. Allis-Chalmers Corp., Engine Div.*, 797 F.2d 1417, 1429 (7th Cir. 1986)).

The Court recognizes that Vera's 2010 evaluation, which, according to the jury, was not tainted by discrimination, resulted in her not receiving a raise in 2010, and that this could support a conclusion that Vera would not have received a raise in 2011 or any subsequent year.  *See Dominic v. Consol. Edison Co. of N.Y.*, 822 F.2d 1249, 1258 (2d Cir. 1987) ("[Defendant] was dissatisfied with [plaintiff]'s performance, as evidenced by the jury's finding that he was not the victim of age discrimination.  In light of [defendant]'s negative opinion of [plaintiff], [the judge] was not required to find that [plaintiff] would have received steady pay raises had he not been discharged[.]").  But, assuming Alstom's reading of the verdict is correct, it is Alstom's wrongdoing that prevents us from knowing whether Vera's entitlement to a raise changed since her 2010 evaluation, and therefore equity weighs against assuming it did not.  *See Malarkey v. Texaco, Inc.*, 983 F.2d 1204, 1214 (2d Cir. 1993) (agreeing with district court that "[a]ny uncertainty as to how far the remedy should reach in order to provide relief is the result of [defendant]'s unlawful retaliation; [defendant] should not be the beneficiary of that uncertainty."); *N.L.R.B. v. Ferguson Elec. Co.*, 242 F.3d 426, 432 (2d Cir. 2001) ("[T]he most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created.") (internal quotation marks omitted).

The evidence showed that, from her 2010 performance evaluation to the time of her termination, Vera completed a challenging project within her revised cost projection, Tr. 79, 103, continued to manage her projects without being placed on a performance improvement plan or otherwise being notified that her job was in jeopardy, *see id.* 128, 135, 533-34, and, in a draft that Barry started for Vera's 2011 performance evaluation, received positive ratings for project-

based objectives, *see id.* 561-64; Ex. 641 at 21009-10.  Some degree of uncertainty is inherent in

determining a back pay award, *see N.L.R.B.*, 242 F.3d at 431, but the Court resolves that

uncertainty against the discriminating party, *Equal Emp't Opportunity Comm'n v. Enter. Ass'n

Steamfitters Local No. 638 of U.A.*, 542 F.2d 579, 587 (2d Cir. 1976).  In light of the jury's

finding, the evidence presented, and the equitable considerations discussed *supra*, the Court will

award Vera a raise for 2011 and each subsequent year.

The parties stipulated that, if the Court awards lost bonuses, they shall be calculated

based upon the average annual bonus awarded to other project managers.  Joint Stmt. ¶ 5.  The

Court sees no reason why it should not apply the same principle to calculate Vera's raises.   Vera

submitted an exhibit providing the average raise for other project managers in 2011, 2012, 2013,

and 2014.  *See* Pl.'s Br. Econ. Damages, Ex. A.  Based on those averages, the Court awards lost

salary as follows:

- For the period April 1, 2011 through June 30, 2011, $546.65 (*see id.* ¶ 2);

- For the period July 1, 2011 through March 31, 2012, $90,285.91 (*see id.* ¶ 3.e.i);

- For the period April 1, 2012 through March 31, 2013, $123,009.13 (*see id.* ¶ 3.e.ii);

- For the period April 1, 2013 through May 30, 2014, $148,272.33 (*see id.* ¶ 3.e.iii);

- For the period June 1, 2014 through May 21, 2015 (the date of judgment on the jury's verdict), $124,312.43 (*see id.* ¶ 3.e.iv).

After subtracting the $118,194.62 that Vera received as separation pay, the total lost

salary award through May 21, 2015 is $368,231.83.  *See id.* ¶ 3.f.

The parties are ordered to file, within fourteen days after this ruling, a stipulation setting

forth amounts, calculated using the methodologies adopted herein, of any lost salary, bonuses,

and 401(k) contributions for the period May 21, 2015 through May 24, 2016 not accounted for in

this ruling.  The Court will then enter a supplemental judgment awarding those amounts.

### 2.     Bonus

For the reasons identified *supra*, the Court concludes that Vera is entitled to bonuses for each year since her termination.  *See Saulpaugh*, 4 F.3d at 145.  The parties stipulated that, if the Court awards bonuses, they shall be calculated as follows:

- 19.278% of salary for fiscal year 2011/2012 ($120,381.22) = $23,207.09, less a $3,910 prorated bonus that Vera received = $19,297.09;

- 13.012% of salary for fiscal year 2012/2013 ($123,009.14) = $16,005.95;

- 11.852% of salary for fiscal year 2013/2014 ($127,090.58) = $15,062.78;

- 17.493% of salary for fiscal year 2014/2015 ($127,827.70) = $22,360.90;

Joint Stmt. ¶ 5.  The total bonus award through Alstom's fiscal year 2014/2015 is $72,726.72.

### 3.     401(k)

The parties stipulated that any award for lost 401(k) contributions shall include: (a) for non-elective contributions, 7% of any amount awarded to Vera for back pay, including salary and bonus; and (b) for elective contributions, 4% of the statutory maximum pre-tax contribution amount for each calendar year for which the Court awards Vera back pay.  Joint Stmt. ¶ 8. Accordingly, as to non-elective contributions, 7% of the total amount awarded for back salary and bonus ($440,958.55) is $30,867.10.  For elective contributions, the total is $3,520.  *See id.* ¶ 8.b.  Thus, the Court awards lost 401(k) contributions of $34,387.10.

### 4.     Prejudgment Interest

"Title VII authorizes a district court to grant pre-judgment interest on a back pay award." *Saulpaugh*, 4 F.3d at 145.  In fact, "it is ordinarily an abuse of discretion *not* to include pre-judgment interest in a back-pay award."  *Id.* (quoting *Clarke*, 960 F.2d at 1154) (emphasis in original).  The purpose of prejudgment interest is to prevent an employer from enjoying an interest-free loan for as long as it delays paying lost wages.  *Id.*

Vera seeks prejudgment interest under Conn. Gen. Stat. § 37-3a.  That statute does not apply.  Where, as here, the judgment is based on both state and federal claims, and is not apportioned between the two, the Court must apply "interest calculated at the federal interest rate." *Thomas v. iStar Fin., Inc.*, 629 F.3d 276, 280 (2d Cir. 2010).  Also, the Court must compound interest.  *See Saulpaugh*, 4 F.3d at 145 (failure to apply compound rate of interest to back pay award was abuse of discretion because compound interest is necessary to make plaintiff whole under Title VII).

Courts in this Circuit use the annual average Treasury bill rate referred to in 28 U.S.C. § 1961(a) for the periods in question, compounded annually.  *See, e.g.*, *Joseph v. HDMJ Rest., Inc.*, 970 F. Supp. 2d 131, 151-52 (E.D.N.Y. 2013) (collecting cases); *Kuper v. Empire Blue Cross & Blue Shield*, No. 99 Civ. 1190 (JSG) (MHD), 2003 WL 23350111, at *5-6 (S.D.N.Y. Dec. 18, 2003), *report and recommendation adopted*, No. 99-CV-1190, 2004 WL 97685 (S.D.N.Y. Jan. 20, 2004).  Those rates can be found on the Treasury Department's website.  U.S. Dep't of the Treasury, *Interest Rate Statistics*, https://www.treasury.gov/resource-center/data-chart-center/interest-rates/Pages/default.aspx (last visited May 23, 2016).  Courts distribute the total back pay award evenly over the back pay period, then apply interest.  *Joseph*, 970 F. Supp. 2d at 152 (collecting cases); *Kuper*, 2003 WL 23350111, at *6 (same).

Because the total back pay award must be determined, the Court will postpone defining the prejudgment interest award until after the parties have submitted a stipulation regarding lost salary, bonuses, and 401(k) contributions for the period May 21, 2015 through May 24, 2016 not accounted for in this ruling.  The parties are ordered to include in that stipulation an agreement as to the total award of prejudgment interest through May 24, 2016, calculated as prescribed *supra*. The Court will include the prejudgment interest award in a supplemental judgment.

C.    Vera's Motion for Reinstatement, or, In the Alternative, an Award of Front Pay (ECF No. 167)

Vera seeks reinstatement to her former position, or five years' front pay.  Alstom counters that reinstatement is inappropriate because Vera's "contempt" for Alstom's standard operating procedures and her former colleagues will create a contentious work environment and subject Alstom to an undue risk of further litigation.

Reinstatement is the preferred remedy in employment discrimination cases.  *See Serricchio v. Wachovia Sec. LLC*, 658 F.3d 169, 193 (2d Cir. 2011) ("[O]ur Circuit favors reinstatement as a remedy in employment cases generally."); *Reiter v. MTA N.Y.C. Transit Auth.*, 457 F.3d 224, 230 (2d Cir. 2006) ("Under Title VII, the best choice is to reinstate the plaintiff, because this accomplishes the dual goals of providing make-whole relief for a prevailing plaintiff and deterring future unlawful conduct").  Reinstatement and back pay "involve the least amount of uncertainty because, in effect, they reestablish the prior employment relationship between the parties[.]"  *Whittlesey v. Union Carbide Corp.*, 742 F.2d 724, 728 (2d Cir. 1984).

The Second Circuit has recognized, however, that "reinstatement is not always feasible . . . because animosity may impede the resumption of a reasonable employer-employee relationship."  *Banks*, 180 F.3d at 364.  For example, a district court properly awarded front pay in lieu of reinstatement where "ample evidence" showed that the employer had exhibited "hostility and outrage" in response to the plaintiff's age discrimination claim, the plaintiff would be "ostracized and excluded[,]" and there was "no justification for [the employer]'s hostile attitude and vengefulness."  *Whittlesey*, 742 F.2d at 729; *see also Equal Emp't Opportunity Comm'n v. Kallir, Philips, Ross Inc.*, 420 F. Supp. 919, 926-27 (S.D.N.Y. 1976) (denying reinstatement where the litigation was "marked by more than the usual hostility between the parties" and plaintiff's job required close working relationships with top executives of the

defendant company and frequent client contact; noting that "three and a half years of bitter litigation" made it so that "the necessary trust and confidence [could] never exist between plaintiff and defendant" and that reinstatement would "sow the seeds of future litigation"), *aff'd*, 559 F.2d 1203 (2d Cir. 1977) (summary order).

However, the natural antagonism that results from litigating discrimination and retaliation claims should not bar reinstatement. *See Kallir*, 420 F. Supp. at 926 (denying reinstatement, but noting that "[s]ome antagonism is the natural result of the filing and litigation of discrimination and retaliation charges and to deny reinstatement merely because of the existence of hostility might be contrary to the remedial goals of Title VII."); *Miano v. AC&R Advert., Inc.*, 875 F. Supp. 204, 225 (S.D.N.Y. 1995) (holding that plaintiffs properly refused reinstatement offer, but noting that "[p]reclusion of reinstatement due to . . . tensions that are the natural bi-product of any litigation would be incompatible with the remedial scheme of the anti-discrimination laws.") (internal quotation marks omitted).

While this case bears some resemblance to *Kallir*, it does not present circumstances warranting departure from the preferred remedy in this Circuit. Over the course of this litigation, the Court has not observed any unusual hostility between the parties, and there was no evidence of unusual hostility before Vera's termination. Moreover, it appears that Vera will not be working directly with Barry and Buchholz as she did before her termination, *see* Tr. 433, 583; 619-20; Pl.'s Reply at 3 n.1 ("Buchholz is no longer with the Company, and Barry is no longer part of project management"), and thus the risk of discord between Vera and the relevant decision-makers is low.

As a senior project manager, Vera will have frequent contact with Alstom's clients, which may have presented a concern in *Kallir*, but not here, because Alstom recognized that

client relations are Vera's strong suit.  Tr. 465, 493.  Alstom characterizes Vera's noncompliance with its standard operating procedures as "contempt," but the jury rejected Alstom's contentions on this point as pretext for retaliation, and the Court will not deny reinstatement on this basis. Finally, Alstom contends that, because Vera testified that she was a better project manager than some of her male colleagues and should have been paid more, she has "contempt" for those colleagues, which will create an "unworkable" situation.  *See* Def.'s Obj. at 5-6.  The Court is not persuaded that this testimony, offered at a discrimination trial, indicates "contempt," or that Vera's reinstatement will be "unworkable."  If some disagreement among colleagues precluded reinstatement, it would be a rare remedy indeed.  Instead, it is the preferred remedy in this Circuit, and appropriate in this case.

Vera spent her entire professional career at Alstom and its predecessors, and had great pride in her work there.  A jury found that she lost her job under unlawful circumstances, and she has been unable to find alternative employment despite reasonable efforts.  Under the circumstances, the Court concludes that restoring Vera to her former position will effectuate Title VII's goal of making whole the victims of retaliation.  The Court is confident that an employer of Alstom's sophistication, and a project manager of Vera's skill and experience, can accomplish reinstatement on an agreeable basis.  Therefore, Alstom shall reinstate Vera to her former or an equivalent position, with the salary that she would have had as of the date of her reinstatement according to the calculations adopted herein, with the same benefits, seniority, rights, and privileges that she would have had.  *See, e.g.*, *Claudio v. Mattituck-Cutchogue Union Free Sch. Dist.*, No. 09-CV-5251 (JFB) (AKT), 2014 WL 3735839, at *4 (E.D.N.Y. July 29, 2014) (salary upon reinstatement should include raises of which plaintiff was deprived); *Shea v. Icelandair*, 925 F. Supp. 1014, 1033 (S.D.N.Y. 1996) (reinstatement includes restoration of

benefits); *Epter v. N.Y.C. Transit Auth.*, 216 F. Supp. 2d 131, 135 (E.D.N.Y. 2002)

("[R]einstatement with retroactive seniority is usually necessary to make the plaintiff whole")

(citing *Franks v. Bowman Transp. Co.*, 424 U.S. 747, 758 (1976)).

## III.    CONCLUSION

For the foregoing reasons, Alstom's Motion for Judgment as a Matter of Law or, In the

Alternative, a New Trial or Remittitur (ECF No. 141) is GRANTED IN PART AND DENIED

IN PART.  Vera's Motion for Reinstatement or, In the Alternative, an Award of Front Pay (ECF

No. 167) is GRANTED.  The Clerk shall enter judgment consistent with this order.  The parties

shall submit a stipulation as ordered herein, and the Court will then enter a supplemental

judgment awarding additional back pay, and prejudgment interest.


SO ORDERED at Bridgeport, Connecticut this twenty-fourth day of May, 2016


/s/ Victor A. Bolden_____
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE